UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| WENDELL SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-257-ART |
| | ) | |
| v. | ) | |
| | ) | |
| PIKE COUNTY, KENTUCKY, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

## I.    INTRODUCTION

At 10:30 a.m. on January 14, 2006, twenty-two year old Rachel Roberts was arrested for public intoxication and possession of drugs.  R. 18 at 5, ¶ 9.  She was booked in the Pike County Detention Center around noon, and by 9:24 p.m. that night, she was dead.  *Id.* at 5, ¶ 13.  The series of events that occurred in the jail that day are the subject of a 42 U.S.C. § 1983 lawsuit instituted by the Plaintiff, Wendell Smith, as administrator of Ms. Roberts' estate and on behalf of her two minor children.  This matter is currently before the Court on the Defendants' Motion for Summary Judgment.  R. 60.

This is a sad case.  A young person has passed away leaving behind two young children and many loved ones.  The question for this Court, however, is whether the laws of the United States provide a remedy for that loss.  Not every mistake, error in judgment, or negligent action can be remedied in federal court.  Here, the issue is not whether jailers made a mistake or acted negligently, but rather whether they violated Ms. Roberts' constitutional rights.  "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though

such errors may have unfortunate consequences."  *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th

Cir. 1999); *see also Hellmann v. Kenton County*, No. 05-31-JGW, 2007 WL 1100730, at *5

(E.D. Ky. April 12, 2007) (unpublished) ("In the end, though, the law recognizes that not every

death - even one that may have been preventable - should result in liability against public officials

who lacked any subjective or objective intent to do harm, and whose only error was in failing to

recognize the difference between a level of intoxication that could be 'slept off,' and a level of

intoxication that would prove to be fatal.").

## II.    BACKGROUND

For purposes of this motion for summary judgment, the facts are presented in the light

most favorable to the Plaintiff, Wendell Smith, as he is the non-moving party.  *See Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157 (1970).  This case involves six critical points in time: when Ms.

Roberts was arrested; when Ms. Roberts was booked at 12:22 p.m.; when Ms. Roberts was

interviewed by police immediately after she was booked; when Ms. Roberts rolled off the floor

mat in her cell at approximately 1:30 p.m.; when Ms. Roberts allegedly refused dinner at

approximately 5:30 p.m.; and when Ms. Roberts' cell-mate discovered that she was not breathing

and obtained help at approximately 8:30 p.m.

### A.    Arrest

According to an affidavit by Detective Amos Mitchell Adkins, Ms. Roberts was arrested

at her vehicle around 10:30 a.m. and charged with public intoxication and possession of a

controlled substance not in its original container.[1]  R. 60, Exh. A.     At the time of her arrest, Ms.

---

[1]  The Uniform Citation, however, indicates that Ms. Roberts was arrested *at 12:00 p.m.*
for public intoxication with a controlled substance (excluding alcohol), *possession of a controlled*
*substance (drug unspecified)*, and possession of a prescription controlled substance not in its

Roberts had a conversation with the troopers about whether it would be better to leave her car parked and locked up or have it towed. *Id.* After discussing the matter, she chose not to have it towed because she did not want to pay a tow bill. *Id.*

### B.    Booking

When the officers brought Ms. Roberts to the jail for booking at 12:22 p.m., R. 68, Exh. J, the supervisor on duty was Defendant Mark Cantrell, with Kenny Rowe serving as booking officer.  Mr. Rowe was assisted by Wanda McCoy, a turn key who was normally stationed at central, the desk at the main entrance of the jail, but assisted at the booking desk when a female arrived for booking and needed to be searched.  R. 81 at 30.  Upon arrival, the officers told the booking staff of Ms. Roberts' charges and gave them her Uniform Citation.  R. 82 at 23-24.

There was no medical personnel at the jail at the time.  *Id.* at 27.  The jail policy was to refuse any detainee that was "in an unconscious state or with any evidence of serious illness, injury, drug overdose or anyone with a reading over .30% blood alcohol content."  R. 68, Exh. F. According to Defendant Cantrell's testimony, "If someone is brought to the jail and they have trouble walking or the officer has to help them up to the booking desk; if they try to use the desk to lean on; if their speech is slurred; if they can't answer the questions you are asking them; on those grounds, we would refuse them and have the officer have them medically cleared."  R. 82 at 48.

Defendant Cantrell did not think that Ms. Roberts fit the characteristics of someone suffering from a drug overdose.  *Id.* at 25-26, 50.  Defendant Cantrell, who was at the booking desk when Ms. Roberts was brought in for booking, *id.* at 23, knew that she was charged with

---

original container.  R. 68, Exh. B (emphasis added).

3

public intoxication and a drug charge and observed that "[s]he was intoxicated" and "[h]er eyes were glassy." *Id.* at 25. Defendant Cantrell also testified that Ms. Roberts did not appear to have trouble answering questions when he saw her and was not having any trouble walking around. *Id.* at 26. Mr. Rowe testified that he "did not believe [Ms. Roberts] was seriously impaired because she was walking and was responsive to questions in a coherent manner." R. 60, Exh. B.

Ms. McCoy asked Ms. Roberts a series of sixteen Inmate Booking Screening Questions. R. 81 at 14-15; R. 68, Exh. C. Ms. McCoy testified that Ms. Roberts was able to verbally respond to each question, and when Ms. Roberts would "kind of look at [her] blank," Ms. McCoy would repeat the question until she answered. R. 81 at 18. In her Incident Report Form, Ms. McCoy stated that she "had to keep asking inmate Roberts the questions over and over." R. 68, Exh. J. The questions Ms. McCoy asked included whether Ms. Roberts had a serious medical condition that may require attention while she was at the jail, *id.* at Exh. C (question 3), whether she had "recently ingested potentially dangerous levels of drugs or alcohol," *id.* (question 8), and whether she had ever experienced DTs or other serious withdrawal from drugs or alcohol, *id.* (question 9). Ms. McCoy testified that Ms. Roberts answered "no" to each question. R. 81 at 14-15. She was also asked whether she understood that she could request a healthcare provider *at any time* while she was at the jail. R. 68, Exh. C (question 14). Ms. McCoy testified that Ms. Roberts responded that she understood. R. 81 at 14-15. Ms. McCoy also stated that if an inmate asked to see a doctor, "they got to see a doctor." *Id.* at 22.

Ms. Roberts signed her name at the bottom of the Inmate Booking Screening Questions form. R. 68, Exh. C. Ms. McCoy testified, "I had to keep nudging her to sign her name because she kept falling asleep. Not falling asleep, just sluggish." R. 81 at 42. Ms. McCoy also signed

4

the bottom of the form. *Id.* at 15-16.

After completing the screening questions, Ms. McCoy took her to the search and shower room and conducted a pat down, finding nothing. R. 68, Exh. J. She also inventoried Ms. Roberts' property. R. 82 at 16. Ms. McCoy recollected that when she took Ms. Roberts to the search and shower room, she noticed that her shoes were untied and tied them for her so that she did not trip on her shoe strings. R. 81 at 45. When asked if Ms. Roberts was able to walk, Ms. McCoy stated, "Stagger, yes." *Id.* at 18.

At some point during this process, Ms. McCoy mentioned to another employee on duty that Ms. Roberts might be a candidate to go to the hospital for evaluation. *Id.* at 43. Ms. McCoy testified that she thinks she made the comment to Mr. Rowe in passing, *id.*, however, she was told that others at the jail had more experience than she did, and if Defendant Cantrell, the supervisor on duty, had been concerned, he would have refused to admit Ms. Roberts into the jail, *id.* at 43-44.

### C.    Police Interview

After Ms. Roberts was booked, searched, and fingerprinted, R. 82 at 50, Ms. Roberts went to the jail's pretrial room and had a twenty-minute interview with arresting officers Detective Adkins and Trooper Sykes regarding the whereabouts of another suspect. R. 60, Exh. A. Detective Mitchell stated in his sworn affidavit that during the interview, she answered the questions "in a very coherent manner," told the officers that she wanted to plea bargain her current charges, and expressed concern that she did not want her children in the house when the additional suspect was arrested. *Id.* Further, Detective Mitchell testified, "She was cooperative and coherent during our time with her." *Id.*

5

### D.    Cell Mat Incident

After the police interview, Ms. McCoy testified that she placed Ms. Roberts in cell 129, located across from the booking desk, R. 81 at 19, and returned to central. *Id.* at 47. Ms. Roberts laid down and went to sleep, R. 82 at 50, and was checked on every twenty minutes[2] to make sure she was breathing, she had not hurt herself, and she had not done anything out of the ordinary. *Id.* at 29.

The jail employees performing the cell checks would "physically walk to the door or window [of the cell] and look in and check on the person, looking for anything out of the ordinary." R. 80 at 38. During one of the routine cell checks at around 1:30 p.m., Officer Groves noticed that Ms. Roberts had rolled off her floor mat. R. 82 at 31. Mr. Groves reported the information to Defendant Cantrell, and both individuals proceeded to Ms. Roberts' cell. *Id.* Defendant Cantrell testified that he called out, "Rachel," maybe twice attempting to wake her, *id.* at 32, and then "[s]he raised up and we slid the mat over away from the bench and she moved back over on her mat and laid back down." *Id.* at 33. Defendant Cantrell testified that he and Mr. Groves did not physically touch Ms. Roberts but only moved her mat. *Id.* After they moved the mat, Defendant Cantrell testified that "[Ms. Roberts] got up and went over to where we had slid it to and laid back down." *Id.* He later described her as crawling over to her mat. *Id.*

The Plaintiff argues that Defendant Cantrell's testimony that she moved to the mat is inconsistent with his incident report form which states, "[Corrections Officer] N. Groves and Lieutenant M. Cantrell helped detainee Roberts on to her mat." R. 68, Exh. M. In response, Defendant Cantrell testified that his testimony and incident report are consistent, R. 82 at 38,

---

[2]  The only time a cell check was not documented was at 8:40 p.m.  R. 60, Exh. C.

because although he did not write down "word for word" everything that happened in the incident report, *id.* at 34, no one helped her up - "[s]he got up on her own and got back to her mat," *id.* at 37. Defendant Cantrell testified that when he and Officer Groves left her cell, "[Ms. Roberts] had her elbows on the mat, looking around the cell." *Id.* at 44.

### E.     Dinner

According to an Incident Report Form filled out and signed by Joe Hall, a jail employee, Mr. Hall started serving dinner to the cells in the booking area 5:33 p.m. R. 68, Exh. O. The report states, "Upon opening cell 129 Inmate Roberts was sleeping and breathing loud. I [corrections officer] J. Hall attempted to wake her up by verbally speaking to her but she did not get up for dinner. Lt. D. Coleman was informed about Inmate Roberts not eating." *Id.* The Incident Report Form was also signed by Dexter Coleman, who had taken over as shift supervisor at 3:00 p.m., replacing Mark Cantrell, on the day of Ms. Roberts' death. R. 80 at 16-17. Defendant Coleman testified that Mr. Hall reported to him that "[Ms. Roberts] had verbally refused a meal." *Id.* at 65. Plaintiff asserts that Mr. Hall's Incident Report Form contradicts Mr. Hall's testimony from a later date that it is his policy to get a verbal response if an inmate refuses dinner and that he reported to his supervisor that day that Ms. Roberts had refused dinner. R. 60, Exh. D. In other words, Plaintiff contends that because the incident report does not mention that Ms. Roberts verbally responded, it is inconsistent with Mr. Hall's later testimony that suggests she did.

### F.     Death

Around 8:30 p.m. or 9:00 p.m., another detainee, Jenna Bowling, was placed in the cell with Ms. Roberts. R. 68, Exh. J. Ms. Bowling's Incident Report Form, *id.* at Exh. Q, indicates

that when she was put in the cell, "The girl was laying face down on her mattress."  She further

stated,

> I knew the girl, I call[ed] her name on many occasions, and she did not respond to
> me.  I put my hand on her back to see if my hand would raise to see if she was
> breathing and there was no response.  I moved her hair away from her face and put
> my hand near her nose and there was no sign of breathing, checked her pulse, and
> could not find one.  Knocked on the door four times for a guard to come.  I told
> them she wasn't breathing, there was no movement from her and I thought
> something was seriously wrong and they needed to come check on her.

*Id.*

Defendant Dexter Coleman and Chris Edmonds, a Pikeville City Police officer, went to the

cell but did not attempt CPR because of the black and gray color of Ms. Roberts' face and her

skin was cold to the touch.  R. 68, Exh. R; R. 68, Exh. D at 89.  Ms. McCoy called 911 at 9:02

p.m.  *Id.* at Exh. S.  A responding medic was unable to find vitals, determined that Ms. Roberts

was dead, and contacted Pike County Coroner's Office at 9:12 p.m.  *Id.* at Exh. T.  The coroner

concluded Ms. Roberts' death was a result of a drug overdose.  *Id.* at Exh. U.  Acute combined

drug (hydrocodone and oxycodone) toxicity is listed as Ms. Roberts' cause of death.  *Id.* at Exh.

V.

## III.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  FED. R. CIV. P. 56(c).  In considering a motion for summary judgment, the Court must view

the facts and draw all inferences therefrom in a light most favorable to the nonmoving party.  *60

Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 322-25. Once the movant meets this burden, the burden shifts and the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

## IV.   DISCUSSION

The Plaintiff brought this 42 U.S.C. § 1983 lawsuit against Pike County, Kentucky, and Mark Cantrell, Dexter Coleman, and Rodney Scott in their individual capacities. Plaintiff

conceded at the hearing on July 9, 2008, that the John and Jane Does should be dismissed, *see* R. 86 at 10-11;[3] R. 84 at 2, ¶ 5.  "To establish a claim under 42 U.S.C. § 1983, a plaintiff must [first] 'identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law.'"  *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001) (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)).  The Plaintiff makes two claims: (1) that the prison officials acted with deliberate indifference by failing to provide adequate medical treatment and (2) that Pike County, Kentucky, failed to adequately train the prison officials.

> **A.    42 U.S.C. § 1983 Claim For Failure to Provide Adequate Medical Treatment Against Defendants Mark Cantrell, Dexter Coleman, and Rodney Scott in Their Individual Capacities**

Pre-trial detainees have a right to adequate medical treatment.  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005) (stating pre-trial detainees' right to adequate medical treatment under Fourteenth Amendment is analogous to prisoners' right under Eighth Amendment); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (recognizing that deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983 when "the indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care . . .");  *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003) ("In the context of medical care for prisoners and detainees, it is well established that deliberate indifference to a

---

[3]  The parties also conceded the following issues at the July 9, 2008, hearing: (1) that all Eighth and Tenth Amendment claims under 42 U.S.C. § 1983 should be dismissed, R. 86 at 9; R. 84 at 2, ¶ 4; and (2) that all official capacity claims against Defendants Rodney A. Scott (as Pike County Jailer), Dexter Coleman (as officer and employee of the Pike County Detention Center), and Mark Cantrell (as officer and employee of the Pike County Detention Center) should be dismissed, R. 86 at 9-10; R. 84 at 2, ¶ 6.

prisoner's [or detainee's] serious illness or injury states a cause of action under § 1983.")
(alteration in original) (internal quotations omitted).

The Plaintiff's 42 U.S.C. § 1983 claim for failure to provide adequate medical treatment requires a showing that "the defendants acted with 'deliberate indifference to the serious medical needs'" of Ms. Roberts. *Watkins,* 273 F.3d at 686 (quoting *Estelle*, 429 U.S. at 104). There is an objective and subjective component to this claim – both of which must be established. *Estate of Carter*, 408 F.3d at 311. The objective component requires the Plaintiff to demonstrate "the existence of a 'sufficiently serious' medical need." *Id.* (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)); *see also Phillips v. Roane County*, Nos. 07-5405/07, 2008 WL 2852898, at *5 (6th Cir. July 25, 2008) ("We have previously explained that where a plaintiff's claims arise from an injury so obvious that even a layperson would easily recognize the necessity for a doctor's attention, . . . it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame. (internal quotations and citation omitted) (alteration in original)). The subjective component requires the Plaintiff to demonstrate that each Defendant "possessed a sufficiently culpable state of mind in denying the medical care." *Estate of Carter*, 408 F.3d at 311 (internal citations omitted).

### *(1)    Objective Component - Sufficiently Serious Medical Need*

The first question thus is whether an objective observer would believe that Ms. Roberts had a serious medical need that demanded hospitalization. In other words, was it "so obvious" to a lay person that Ms. Roberts should have been sent to the hospital?

Viewing the evidence in the light most favorable to the Plaintiff, Ms. Roberts arrived at

11

the jail intoxicated and with glassy eyes. R. 82 at 25. Ms. McCoy had to keep repeating the questions, R. 68, Exh. J, and had to nudge her to sign her name, R. 81 at 42. Ms. McCoy also said Ms. Roberts was staggering. *Id.*

It is undisputed, however, that Ms. Roberts never informed the arresting officers or anyone at the jail that she had overdosed on drugs and/or had ingested a potentially lethal combination of drugs. Even when asked if she had "recently ingested potentially dangerous levels of drugs or alcohol," Ms. Roberts said no. R. 68, Exh. C. She was asked if she understood that she could request a healthcare provider. *Id.* She responded that she understood. R. 81 at 14-15. Ms. Roberts also had a twenty-minute interview with the arresting officers. R. 82 at 50. Detective Mitchell described her as "cooperative and coherent." R. 60, Exh. A. She was not examined by medical personnel, as none were on the premises at the time. R. 82 at 27. Ms. Roberts was placed in a cell and went to sleep, *id.* at 50, and was checked on every twenty minutes. R. 80 at 37. The staff even entered her cell at one point upon noticing she had rolled off the floor mat. R. 82 at 31. She later refused dinner, R. 68, Exh. O; although, as discussed above, it is unclear if she did so verbally or just did not respond.

These symptoms are not atypical nor do they distinguish Ms. Roberts from the multitude of drug and alcohol abusers the jail admits everyday. Fortunately, most, if not all, of those admitted "sleep off" their intoxication. Unfortunately, Ms. Roberts did not.

In similar situations, courts have found that prison guards do not have to (1) send every intoxicated person to the hospital; (2) do not have to be mind readers, and (3) can take a prisoner at their word when they say they did not take drugs and do not need healthcare. For example, in *Grayson v. Peed*, 195 F.3d 692 (4th Cir. 1999), the decedent, Collins, was "acting crazy" in a

12

restroom at the mall. *Id.* at 694. After resisting arrest, officers subdued Collins. *Id.* In Collins'

backpack, officers found film canisters containing marijuana and PCP. *Id.* During the period

Collins was booked, he was acting "irrationally, his speech was slurred and he kept repeating in an

intoxicated manner." *Id.* During the next twenty-four hours, Collins acted belligerent on several

occasions. *Id.* At one point, officers had to subdue him – punching him "seven to nine times."

*Id.* Later, officers observed that Collins was unconscious. *Id.* Officers checked his pulse, and he

appeared alright. *Id.* A little later, however, Collins ceased breathing. *Id.*

     Collins' estate claimed that the arresting officer should have recognized the serious

medical need of Collins and taken him to a hospital. *Id.* at 695. The Fourth Circuit noted that the

need must be both "apparent and serious." *Id.* And, at the time of the arrest, there were no

external signs that would indicate to an officer that he should take Collins to a hospital rather than

jail; there was no bleeding, vomiting, choking, seizure, and Collins did not have trouble breathing.

*Id.* Collins' internal problems were simply not known to the arresting officer, nor did Collins

inform him of them. *Id.* Most importantly, in assessing this objective component, courts cannot

"demand officers be mind readers." *Id.* Collins' expert's testimony that he should have been sent

to a hospital was nothing more than "20/20 hindsight." *Id.*

     Ms. Roberts is no different than Mr. Collins. Like Collins, she did not inform the guards

she needed healthcare. She did not tell the guards she had ingested a dangerous or excessive

amount of drugs. And, she was not bleeding, vomiting, choking, suffering from a seizure, or

having trouble breathing.

     Similarly, in *Schaak v. City of Taylor*, No. 05-1481, 2006 WL 1005039 (6th Cir. Apr. 17,

2006) (unpublished), the Sixth Circuit held that placing an inebriated person in a detox cell is not

objectively improper.  In that case, *Schaak*, who was intoxicated, lost his balance twice and had to be supported by officers.  *Id.* at *1.  He was also belligerent.  *Id.*  Thus, officers placed him in a detox cell rather than booking him.  Even though they recognized he might fall again, the Court stated that "recognition of an increased risk of Schaack *falling* is not the equivalent to recognition of a *substantial* risk of *serious* harm."  *Id.* at *3.  Schaak ultimately fell, hit his head on concrete, and subsequently passed away.  *Id.* at *1.

The language of *Schaak* is especially appropriate here:  "[p]lacing an intoxicated man, even a highly intoxicated man, in a detoxification cell while awaiting booking does not violate contemporary standards of decency."  *Id.* at *3 (citations omitted); *see also Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999) (stating that to mandate "as a matter of constitutional law" that officers take all criminal suspects under the influence of drugs or alcohol to hospital emergency rooms rather than detention centers "would be a startling step to take"); *Beyer v. City of Johnson City*, No. 2:01-cv-45, 2003 WL 23737298, at *5, n.5 (E.D. Tenn. Feb. 24, 2003) (unpublished) (recognizing that the Constitution does not require the "extraordinary accommodation" of having "doctors available upon booking to determine if an intoxicated prisoner may be incarcerated or should be taken to the hospital").

In conclusion, it was not unreasonable for prison officials to think that Ms. Roberts simply needed time to sober up.  She neither exhibited symptoms that so obviously demanded immediate medical care nor did she ask for any help or care.

### (2)    *Subjective Component – Sufficiently Culpable State of Mind in Denying the Medical Care*

The subjective component requires an inmate to show that prison officials have a

"sufficiently culpable state of mind." *Bowman v. Corr. Corp. of America*, 350 F.3d 537, 544 (6th Cir. 2003). What this means is that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Ford v. County of Grand Taverse*, No. 07-1062, slip op. at 10 (6th Cir. Aug. 5, 2008) (stating that deliberate indifference requires more than "mere negligence": "a prison official cannot be found liable . . . for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." (internal quotation marks and citations omitted)). Thus, the Plaintiff must show (1) that a substantial risk of serious harm existed; (2) that the officials knew of the risk; *and* (3) that the officials consciously disregarded the risk by refusing medical care to Ms. Roberts. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) ("If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments.").

The Plaintiff has failed to point to any evidence that establishes that the officials were aware of the risk and consciously disregarded it. Again, the case law is illustrative. Indeed, both *Estate of Abdel-Hak* and *Watkins* involved cases worse than the one at bar and neither case found that officers were deliberately indifferent.

In *Estate of Abdel-Hak*, Abdel-Hak ran out of a bar screaming and tried to get into a police car. *Estate of Abdel-Hak v. City of Dearborn*, No. 88-1713, 1989 WL 33097, at *1 (6th Cir. Apr. 6, 1989) (unpublished). When he was unsuccessful, Abdel-Hak kicked the officer in the

15

leg. *Id.* The officers subdued him. *Id.* They knew he was intoxicated and saw that he was foaming from the mouth. *Id.* At the station – after four officers had to subdue him again – Abdel-Hak passed out, but still had a pulse. *Id.* Two minutes later, he was dead. *Id.* The Sixth Circuit rejected the argument that officers have an obligation to "take all chemically impaired persons to the hospital." *Id.* at *2. The Sixth Circuit concluded that failure to take a drunken detainee to the hospital does not even constitute negligence, let alone deliberate indifference. *Id.*

In *Watkins*, during a search officers found crumbs of crack cocaine as well as one big piece. 273 F.3d at 684. Watkins was licking his lips and "a pink foamy drool was coming from his mouth." *Id.* "Officers also spotted a white speck near Watkins's mouth." *Id.* He was offered medical care and refused. *Id.* When Watkins was brought to the jail, Watkins complained of an upset stomach, appeared drunk or high, fell from a chair onto the floor, and was observed making chewing motions with his mouth. *Id.* Watkins denied swallowing drugs and refused medical treatment again. *Id.* at 685. Later, Watkins grabbed his stomach, bent over like he was going to throw up, and fell or lowered himself to the floor. *Id.* Shortly thereafter, Watkins told deputies he felt sick, and they promised to observe him, which they did. *Id.* Within two hours, Watkins had passed away. *Id.*

The Sixth Circuit stated that "it is not enough for plaintiff to demonstrate a question of fact whether the police officers or sheriff's deputies should have known that Watkins had swallowed drugs." *Id.* at 686. The plaintiff had to actually demonstrate that the officers *knew* "Watkins needed medical attention for swallowing drugs." *Id.* Since the plaintiff could not demonstrate this, the officers could not be held liable. *Id.*

Each officer must be analyzed individually to determine the subjective component – i.e.

16

whether he knew of a serious risk to the Plaintiff and consciously disregarded it.  *See Speers v. County of Berrien*, No. 05-2072, 2006 WL 2567533, at *3 (6th Cir. Sept. 1, 2006) ("In handling [the subjective] component of the test, we must evaluate each defendant individually because we generally do not impute knowledge from one defendant to another.").

**Mark Cantrell.**  Plaintiff faults Defendant Cantrell, the shift supervisor and senior officer on duty until 3:00 p.m., for admitting Ms. Roberts to the jail, failing to have her examined by medical personnel, failing to have Ms. Roberts "carefully and properly monitored," and failing to determine her condition after helping her return to her mat.  R. 68 at 23.[4]  The Plaintiff, however, fails to point to a single fact to establish that Defendant Cantrell both was aware of a serious risk to Ms. Roberts and consciously disregarded it.  *Cf. InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) (holding a district court is not obligated "to wade through and search the entire record for some specific facts that might support the nonmoving party's claim").  Indeed, its brief does nothing more than establish that he *may* have been negligent in his assessment of her condition.

When Ms. Roberts was admitted to the jail, Defendant Cantrell was stationed at the booking desk and witnessed Ms. Roberts' booking process.  R. 82 at 18.  Defendant Cantrell testified that Ms. Roberts' eyes were glassy and that she was intoxicated, *id.* at 25, but that she did not appear to have trouble answering questions or walking.  *Id.* at 26.  He later went to her cell when Officer Groves reported to him that Ms. Roberts had rolled off her mat.  *Id.* at 31. Defendant Cantrell called out her name, she awakened, raised up, and laid back down after the

---

[4]The Plaintiff summarizes the allegations against the individual defendants in the qualified immunity section of its brief.  *See* R. 68 at 22-24.  The Court thus has taken the allegations from that section and applied them here.

mat was repositioned. *Id.* at 32-33. Even if the Court agreed with the Plaintiff that Defendant Cantrell's incident report was inconsistent, R. 68, Exh. M, which said he and Officer Groves "helped" Ms. Roberts on to her mat, nothing indicates that this situation demonstrated a substantial risk of serious harm. Even if the situation rose to such a level, no evidence was presented that Defendant Cantrell was aware of the severity of the situation. "If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments." *Watkins*, 273 F.3d at 686 (citing *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994)). Plaintiff has not pointed to specific facts from which the Court could conclude that Defendant Cantrell was aware of a serious risk and consciously disregarded it. Instead, Plaintiff argues that since his paperwork was "inconsistent," he must have been aware of the risk and attempting to cover it up. Again, this is nothing more than pure speculation. The inconsistency in the paperwork does not equal deliberate indifference.

**Dexter Coleman.** The Plaintiff argues that Defendant Coleman "failed to properly monitor Ms. Roberts' condition, and failed to have her examined by properly trained medical personnel." R. 68 at 24. Dexter Coleman took over for Defendant Cantrell in the afternoon. R. 80 at 16-17. When Defendant Coleman arrived, Ms. Roberts was "sleeping it off" in her cell. This is not unusual. Defendant Coleman testified that he knew Ms. Roberts was in jail for public intoxication (based on ingesting drugs), *id.* at 48-49, and personally observed Ms. Roberts on at least seven separate occasions, but never saw her on her feet or sitting up, never spoke to her, and never took her vital signs. *Id.* at 50-51, 77. No evidence was presented that Defendant Coleman knew that Ms. Roberts was in need of medical attention. She did not ask for a doctor. She was not frothing at the mouth. She was not doing anything out of the ordinary during the routine cell

18

checks.

When Ms. Roberts' cell mate knocked on the door for help, Officer Flinchman opened the cell door, *id.* at 68, and requested that Defendant Coleman come to the cell, R. 68, Exh. R.  At that time, Defendant Coleman ordered central to call 911.  *Id.*

These actions do not demonstrate deliberate indifference, which requires "something more than mere negligence."  *Farmer*, 511 U.S. at 835.  The Plaintiff has pointed to no evidence that indicates Defendant Coleman had the requisite mental state – that he knew of the risk *and* consciously disregarded it.

**Rodney A. Scott.**  The Plaintiff faults Defendant Scott, the jailer, for his "failure to take steps to give practical meaning to the prohibition against admitting arrestees who had overdosed on drugs – either through the promulgation of more detailed policies or by training his officers to identify and react properly to symptoms of a drug overdose."  R. 68 at 22.  The Plaintiff further claims that this "was indicative of his deliberate indifference to such arrestees and the consequences to their safety and welfare while in his custody."  *Id.*  These allegations simply do not meet the Plaintiff's burden of establishing "deliberate indifference."

The Plaintiff concedes that Defendant Scott "had no direct contact with Ms. Roberts."  *Id.* Indeed, he was not present at the jail during the booking process or supervision of Ms. Roberts because he did not work on Saturdays.  R. 79 at 24.  Someone from the jail telephoned Defendant Scott at home and reported the incident right after Ms. Roberts was found dead.  *Id.* at 71.  He was told on the phone that the city police were there and the coroner had been called.  *Id.* Therefore, Defendant Scott could not have known of or disregarded an excessive risk to Ms. Roberts' health or safety.

19

It is well established that the Plaintiff must point to facts in the record to withstand summary judgment. Here Plaintiff has not pointed to a single fact that establishes that Defendant Scott was aware of Ms. Roberts' condition or that she was in danger.

Similarly, to the extent the Plaintiff is arguing that Defendant Scott's inadequate training of his underlings resulted in Ms. Roberts' death, again the Plaintiff has not identified specific facts demonstrating that Defendant Scott exhibited deliberate indifference toward Ms. Roberts by failing to train properly and supervise Cantrell and Coleman. *See Isbell v. Ray*, No. 98-6377, 2000 WL 282463, at *8 (6th Cir. Mar. 8, 2000) (unpublished) (citing *Warner v. Grand County*, 57 F.3d 962, 968 (10th Cir. 1995) (holding that county was not deliberately indifferent to rights of female arrestees, despite the absence of evidence showing that the county trained officers for strip searches of female detainees)).

Finally, to the extent the Plaintiff is arguing that Defendant Scott is liable as a supervisor, the Plaintiff must show "[a]t a minimum, . . . that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (citation omitted). First, as discussed above, there was no "unconstitutional conduct" by his subordinates. Second, even if there were, there is no evidence that Defendant Scott was aware of it. Thus, Defendant Scott is entitled to summary judgment.

**Conclusion.** In the end, there simply is no evidence that the officers were both aware of the risk and consciously disregarded it. The Plaintiff faults the officers for not being more proactive in their assessment of Ms. Roberts. Here, Ms. Roberts was clearly intoxicated. But no evidence exists pointing out that she was in immediate danger. As discussed above, she was not

20

vomiting, choking, suffering from a seizure, or having trouble breathing.  Rather, she exhibited symptoms unfortunately seen everyday in jails across the country.  The officers placed her in a cell approximately five feet from the booking desk.  Police officers interviewed her during this period and there is no evidence they indicated that the jail should take her to the hospital.  The jail officers made periodic checks – approximately every 20 minutes – of Ms. Roberts.  While they did not go into her cell, they looked through a window and saw that she was still sleeping it off.  "An officer could hardly be faulted under *Estelle* for believing that [Roberts] needed nothing so much as to sleep it off."  *Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999); *see also Schaak v. City of Taylor*, No. 05-1481, 2006 WL 1005039, at *3 (6th Cir. Apr. 17, 2006) (unpublished) (holding it is acceptable and within contemporary standards of decency to place a highly intoxicated individual in a detox cell).

Plaintiff argues that the officers should have recognized that she was declining and attempted to wake her.  But, how were the officers to know?  She did not do anything to cause an officer to check.  When she fell off of her mat, the officers assisted her in getting back on it.  There is no evidence she asked for help at this time, vomited, or was having trouble breathing.  Simply put, the officers are not required to be mind readers.  They are not required to guess what, if any, drugs individuals took.  And, they cannot predict that someone may have mixed a lethal combination of drugs.  As discussed at the outset, this is a sad result.  But sympathy and sadness do not equal a conscious disregard.

In short, the Plaintiff wants this Court to mandate that prisons take anyone exhibiting symptoms of being under the influence of drugs or alcohol to the hospital.  As the Fourth Circuit stated, this would be "a startling step to take."  *Grayson*, 195 F.3d at 696.

21

### (3)    *Qualified Immunity*

Even if the Court were to find that the Constitution mandated that the jail officers had to take intoxicated persons to the hospital instead of a detox cell, the jail officers would be entitled to qualified immunity since this was not "clearly established" at the time Ms. Roberts arrived at the jail.  Officers are entitled to qualified immunity from suit when a right they violate was not clearly established.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The inquiry of whether a right is clearly established is taken "in light of the specific context of the case, not as a broad general proposition."  *Id.*  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* at 202.  Thus, the relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.*; *Key v. Grayson,* 179 F.3d 996, 1000 (6th Cir. 1999) ("If reasonable officials could disagree on the issue, immunity should be recognized. . . .  For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.") (internal quotations and citations omitted).  Plaintiff has not pointed to any case law establishing that a reasonable official would know he was violating the law by not taking Ms. Roberts to the hospital.  Thus, the defendants are entitled to summary judgment on this ground as well.

### B.    42 U.S.C. § 1983 Claim Against Defendant Pike County, Kentucky, Alleging Failure to Train

Finally, Plaintiff claims that Defendant Pike County, Kentucky, is subject to municipal liability because the County failed to properly train the individual Defendants in violation of 42

U.S.C. § 1983.  Even if the County's training was inadequate or improper, however, it cannot be held liable in this situation.  The law is well established that if "no constitutional violation by the individual defendants is established, the [governmental] defendants cannot be held liable under § 1983."  *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001); *see also City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of unconstitutionally excessive force is quite beside the point."); *Bowman v. Corr. Corp. of America*, 350 F.3d 537, 545 (6th Cir. 2003) (holding that if officials did not violate Eighth Amendment right, jail "cannot be held liable for its policy even if it were to encourage deliberate indifference"); *Bukowski v. City of Toledo*, 326 F.3d 702, 712-713 (6th Cir. 2003) ("Because [the City] can only be held liable if there is a showing of liability on the part of its officials, the determination that the City's officials did not violate the plaintiffs' constitutional rights resolves the claim against the City as well."); *Scott v. Clay County*, 205 F.3d 867, 879 (6th Cir. 2000) (The "conclusion that no officer-defendant had deprived the plaintiff of any constitutional right *a fortiori* defeats the claim against the County as well."); *Hancock v. Dodson*, 958 F.2d 1367, 1376 (6th Cir. 1992) (holding that the police search was justified by exigent circumstances and that "[b]ecause the only city police officer present committed no constitutional violation, the city cannot be held liable").[5]

---

[5]In the event, the Court found that the officers did commit a constitutional violation, but were entitled to qualified immunity, then it would have to determine whether the municipality committed constitutional violations.  *See, e.g.*, *Barber v. City of Salem*, 953 F.2d 232, 237-38 (6th Cir. 1992).  That, however, is not the case here.

## V.       CONCLUSION

For the reasons stated above, having found no constitutional violations, summary judgment is granted on all 42 U.S.C. § 1983 claims in favor of Defendants Pike County, Kentucky, and Mark Cantrell, Dexter Coleman, and Rodney Scott in their individual capacities. Because the § 1983 claims, which served as the basis for federal jurisdiction, are now dismissed, the Court declines to exercise supplemental jurisdiction over the Plaintiff's state law claims.  R. 18 at 3, ¶ 2; *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."). Therefore, the Plaintiff's state law claims are dismissed without prejudice.  *See Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) ("[T]he usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment.").

Accordingly, it is **ORDERED**:

(1)      The 42 U.S.C. § 1983 claims against all Defendants are **DISMISSED WITH PREJUDICE**.

(2)      The state law claims against all Defendants are **DISMISSED WITHOUT PREJUDICE**.

(3)      A separate Judgement will be entered contemporaneously with this Memorandum Opinion and Order.

24

(4)    This matter shall be **STRICKEN** from the Court's active docket.

This the 18th day of August, 2008.

**Signed By:**

**_Amul R. Thapar_**

**United States District Judge**